Good morning. May it please the court. My name is Stephen Montoy. I'm here representing Sergeant Jeffrey Green of the Phoenix Police Department. Sergeant Green, after serving honorably in the United States Marine Corps, started with the City of Phoenix Police Department in 1994 when he was virtually a kid. He was 23 years old. He had a great career at the department. He rapidly rose in responsibility. He became a field training officer just three years into the job, teaching young officers, new officers, how to do their job. He was ultimately awarded a position on the department's SWAT team, where he did extremely well. He got over 30 commendations. He got the department's Medal of Merit. He was given Officer of the Awards twice. He had no record of discipline. His career was heading upward. But then he complained. He was in the mounted unit. Sergeant Green, the record will indicate, is from New Mexico and he likes to ride horses. He started riding horses for the department. He was subjected to a series of sexually offensive comments by his colleagues. He complained about them. He was told by his immediate supervisor, Lieutenant Jeff Lizell, that if he complained about those comments that he would be transferred out of the unit. Initially, Sergeant Green did not complain. He liked the unit. He loved what he was doing. Ultimately, he did complain. Lieutenant Lizell came forth with his threat and transferred Sergeant Green out of the unit. Sergeant Green went to the EOC and complained. The EOC investigated Sergeant Green's charge of discrimination and found that there was reasonable cause supporting the charge. The back up a little. I'm not sure this is directly relevant. Discrimination based on the sexuality of Mr. Green? Was that the issue? Yes, Your Honor. There's not a lot in the record on that intentionally. But what happened, Your Honor, was some of Sergeant Green's colleagues thought that he was gay and they were making discriminatory comments towards him and he complained about it. Okay, but for our purposes, the issue is that he made the EOC complain. Yes, Your Honor. The only charge, yes, Judge Schroeder. Excuse me, I'm sorry. He was transferred from the mounted unit to, is this to the robbery unit? Yes, Your Honor. After he complained, after the EOC found cause, and after the EOC engaged in conciliation, that's the resolution they made. They transferred him to the robbery unit, which was led by Commander Faulkner, who is actually the cousin-in-law and good friend of Lieutenant Luzette Lizelle. Sergeant Green knew that when he agreed to go to the robbery unit, but because there are rotations, Sergeant Green believed that Commander Faulkner would soon be transferred out of the unit, but in fact, he wasn't. When Sergeant Green arrived, before Sergeant Green even arrived at the unit, even though he was only a sergeant, the commander met with the entire department and told everyone that Sergeant Green was being transferred to the unit as a result of some type of claim against the city. When Sergeant Green got to the unit, his first lieutenant, Lieutenant Messina, gave him 26 expectations, which was more than Sergeant Green had ever seen in his career, and she almost immediately accused him of misconduct. Sergeant Green felt a chill. When he first met with Commander Faulkner to try to clear the air because he knew that Lieutenant Lizelle was Commander Faulkner's cousin, Commander Faulkner told him that if you wait by the river long enough, you'll see your enemy's bodies float by, and that he was kind of a co-conspirator himself. Sergeant Green got scared. He complained to the city's Equal Opportunity Department because he feared retaliation, and an investigation ensued. The investigator, a lady very experienced with EOD investigations against the department, her name is Marquita Bean, found evidence supporting Sergeant Green's claims of retaliation against Lieutenant Messina. However, even though years, seven years passed at the time of trial, and that was over a year ago, the City of Phoenix never concluded its investigation. Now, the district court found and the City of Phoenix argued that that's not an adverse employment action to have a seven-year investigation. That may be true, but that wasn't our point. When an employer conducts a seven-year investigation of a relatively simple claim of retaliation, we believe that the finder of fact could reasonably conclude that that was evidence of the city's culpability and tolerance of the retaliation of which Sergeant Green complained. Lieutenant Messina also accepted a complaint that Jeff Green made on behalf of the woman detective on his squad, Candace Wilson. Candace Wilson was at a wedding. A sergeant in the robbery unit roped her. Specifically, the sergeant grabbed her allegedly between the legs. Sergeant Green helped Candace Wilson file a complaint. After that, all heck broke loose. A witness, a longtime veteran of the robbery unit named Al Richard, Alfredo Richard, testified without contradiction that after Candace complained of sexual harassment and Jeff Green helped her, the working environment in the robbery unit turned toxic. And there was hostility against Candace Wilson, Jeff's subordinate, and Jeff Green himself. And Detective Richard also noted that one of the sources of that hostility was Jeff's new direct supervisor, Troy Finley. Uh, on August 8th or July, uh, excuse me, July 7th, Troy Finley, Lieutenant Finley ordered Jeff Green to get rid of Candace because Candace had complained about the sergeant regarding sexual harassment. Now the city- All right, may I interrupt for a moment here? Yes, you're on. I'm trying to, you're giving a series of facts. It's a good, good summary to the jury. Yes, you're on. But, um, but I'm trying to relate them to the actual claims of retaliation that are in this case that the district court held you hadn't, uh, uh, met your burden of proving. So where are you with respect to the claim of retaliation that, uh, that you're claiming, um, you have, you made your burden of proving? Yes, your honor. And I was about to get to that. Thank you. But you're, so, uh, Finley tells Jeff Green to get rid of Candace because she complained about sexual harassment. Jeff tells his, uh, boss, boss, we can't do that. That's retaliation. Uh, Finley gets mad and- What is retaliation? What is retaliation for what? I'll tell you, uh, two things. Finley retaliated against Green for helping Candace Wilson file her charge of discrimination for refusing his directive to get rid of her and to reporting, uh, Lieutenant Finley's retaliatory order, uh, to Chief Blake McClelland, who was in charge of all of them. And what is the retaliation? The retaliation was that there was another, uh, uh, Lieutenant Finley confronted Green and told Jeff Green, hey, you have to do something about Candace Uh, it would be retaliation against Candace Wilson. So he refused to obey the order. And then what Jeff Green did was he went and complained to Blake McClelland, the assistant chief, and here's what Finley did, Judge Schroeder, that was retaliatory. As soon as Jeff left the office, he went to Faulkner and said, hey, Jeff is crazy. He's gone berserk. I'm fearful for my life. They subsequently told Chief McClelland that and Jeff Green was put on administrative leave because he was allegedly crazy and they were afraid of him for approximately three months. And as soon as he got back from administrative leave, Finley, for the first time in Green's career, uh, started to issue disciplinary reprimands and supervisory warnings to Jeff Green. He was taken away from his squad. He was put on another floor to take all his, uh, supervisory responsibilities were taken away. And, uh, he got several unmets in his 2012 performance review based on bogus reason. So, Mr. Montoya, let me ask the following. I'm very familiar with the narrative that you're giving. And it's pretty clear that Finley and the others didn't like Mr. Green very much. But for it to be retaliation, it's got to be bad treatment and retaliation for something that he did that is a protected ground. So what is it that he did that's just bad treatment? Yes, Your Honor. First of all, uh, it is retaliation to oppose, uh, when, when you're punished or subjected to do an adverse employment action for opposing discrimination in the workplace, that's retaliation. Moreover, Jeff Green complained to EOD about retaliation. He complained to Marquita Beam. That's an internal complaint. He also complained to the EOC and he also complained to Chief Blake McClelland. So Jeff Green complained about discrimination and retaliation both internally within the department to EOD and to Blake McClelland and also externally to the EOC in addition to opposing, uh, Lieutenant Finley's order to retaliate against Candace Wilson because she complained that another sergeant had sexually harassed her. So can you explain, can you explain what is the adverse action that caused your client damages? Yes, Your Honor. There were actually several. First of all, he was placed on administrative leave. Second of all, he was subjected to two fitness. Was he paid? Uh, yes, he was paid, Your Honor, but it disrupted his work schedule. And in the police force, Your Honor, being placed on involuntary administrative leave has a stigma, uh, that is very hurtful to the career of someone who is aspiring for promotion. So he was placed on administrative leave. He was also subjected to two fitness for duty examinations. And Your Honor, this court has specifically said that fitness for duty examinations can constitute a pretext to harass employees and consequently, they must be predicated upon objective business necessity for which the burden bearers of the time in Sergeant Green's long career. He started to get disciplinary warnings and started to get reprimanded and started to get unsatisfactory performance reviews. And they happened almost immediately after he complained that Lieutenant Finley. Yes, Judge Schroeder. Judge? I don't think there was a question. Okay, I thought I was looking at Judge Schroeder and I thought she was about to ask me a question. Uh, and it looks like I have a question, though. The district judge in written order in footnote indicates that were the question in front of her, she would find that the $1.5 million verdict is too high. Uh, if we were to reverse the district judge on the JMOL and to say that the trial stands and the verdict, the liability stands, do you have, uh, is there a pending motion or a motion that could be made or revive with respect to remittiture? Or is that is that is that is that is that ship sailed? Your Honor, in our view, that ship has sailed. In our view, that footnote by the judge, uh, really was illustrative of, uh, really, uh, bias on the favor on the part of the court. Uh, my question is whether or not a remittiture motion would be available if we were to reverse the decision of the district court. And your view is no, our view is no. Your Honor, it would be untimely. The time period in which to file for, uh, judgment is a matter of law, a motion for a new trial. Uh, any rule 60 motion has long since expired because under the rules, Your Honor, those motions are not filed sequentially. They are filed simultaneously. Mr. Montoya. I'm sorry. Would you just tell me the question I was trying to ask was how did the jury get the 1.5 million figure? Uh, Your Honor, they got it based upon the facts, based upon emotional distress. And Your Honor, I've actually briefed that issue on other cases. And the Ninth Circuit has a long history of allowing large damage awards based upon emotional distress alone. Uh, that is the law of the circuit, but that issue hasn't been addressed. Uh, uh, Your, Your Honors, if they were to reverse, uh, that issue, I'm sure it would be revisited in the district court on remand. And we would argue that the motions are untimely. I don't know what the right in front of us. It would be a question in front of the district court. We've taken you over time. Let's hear from the other side, but we'll give you a chance to rebut. Thank you. Good morning, Your Honors. May it please the court. Steve Coleman on behalf of defendant City of Phoenix. Um, to begin, I just want to briefly address Judge Fletcher's question about whether or not there's an opportunity for a motion for new trial. Um, Mr. Montoya indicated that the time has passed. However, a remanded, or, um, that, uh, the jury verdict was rendered on April 10th of 2019. Uh, 18 days later, Judge Medawa issued an order setting aside and vacating the judgment in this case. So the parties could proceed with briefing this rule 50, a motion for judgment as matter of law. It's excerpt of record page 41. So the 28 day deadline never passed because the judgment was set aside because the judge wanted us to proceed with the parties having the opportunity to finish briefing on the motion on judgment matter law. And then if necessary, transition to motion for remitted or a new trial. It's still open, but that question is not in front of us. That would be the district judge to decide in the first instance. Correct. I just wanted to address your honors. So in this case, obviously the court is required to draw all reasonable inferences in favor of the plaintiff. However, what plaintiff is asking for goes far beyond inference drawing. He's asking this court to engage in ranked speculation and to invent new facts that don't exist. And if I talk about the adverse employment actions, the first of which is that the plaintiff was ordered to go undergo a fitness for duty evaluation. And plaintiff's counsel said that there's a standard that you have to show objectiveness and business necessity. That's the standard under the Americans with Disabilities Act for whether or not there's an unlawful medical examination. That's not the standard that applies here in a Title VII retaliation case. Well, let me ask you this. Let's assume I'm not asking you to concede. Let's assume that Mr. Green engaged in protected activity. And let's assume that in response to and caused by his engagement in protected activity, he's asked to undergo what you guys call a PMG. Would that be an adverse employment action? For him to undergo if it were retaliatory, for him to undergo a fitness for duty examination, if he could show... Yes, would the PMG be retaliatory? Standing alone, I don't believe so, unless you can show some other harm to the terms and conditions of employment or his reputation or loss of overtime or some other loss of... So why do you say that? Are you saying because there's no adverse impact on him to be subjected to the PMG? Correct. But that can't be right, given what our retaliation law is. Our retaliation law is something that's absolutely trivial if its predicted or expected consequence is to discourage the protected activity. It may be that it will affect damage judgment, but it doesn't mean it was not retaliatory. But it has to be materially adverse and not trivial. And this court could draw to the conclusion that it is materially adverse. Now, what that doesn't impact is the lack of evidence of but-for causation. So with the first IME, I want to talk about the evidence here. Plaintiff testified that he doesn't know who ordered the IME. He doesn't know why the IME was ordered. So this case boils down to an allegation that he engaged in protected activity two years earlier by filing the charge involving Lieutenant Lizell. And then two years later, some unknown person made some decision for unknown reasons that affected him negatively. And that would require the court to engage in speculation and to invent new facts in order to support. Well, it required the jury to decide whether or not it was retaliatory. I think that sounds like a jury question to me. Well, to be retaliatory, we need a couple of things. First, we need the identity of the person who the bad actor was. And we don't have that here. And you need to know that the bad actor had knowledge of the protected activity. The cases have been universally clear, including Supreme Court precedent in Breedon versus Clark County and numerous Ninth Circuit cases like Yards Off, that you have to have the decision maker's knowledge. If the decision maker doesn't have knowledge of protected activity, then there can be no causal nexus. Was there no evidence from which the jury could permissibly have inferred knowledge? Obviously, the actors are not going to say, I had knowledge and therefore I did the following. And it will be difficult for Mr. Green to obtain that knowledge. But is it permissible based on the evidence in front of the jury for the jury to have inferred knowledge? This is a department people talk, doesn't strike me as the inference was all that far fetched. Well, there needs to be some evidence to support the inference. And we don't have that here. So I'll give you an example. So with Lieutenant Messina, on the first day of work, a plaintiff complained that she gave him job expectations that he thought were unreasonable. And the protected activity he engaged in was two years earlier. He was in a different unit and he filed the charge. And the plaintiff said, and his argument, the total sum of the evidence on that point of her knowledge is she was his supervisor. She probably knew. Well, if there had been evidence that the city provides new supervisors. She probably knew, everybody knew. Faulkner said  he said a settlement. He didn't say what the testimony is. He's joining us a settlement. We don't know that Lieutenant Messina was in the room. We know two years earlier. So the evidence is that he said it to the entire unit. The entire I don't believe it was the entire robbery unit. I believe it was the people that he was going to be supervising. But I have to clarify that on the record. But so back to my case, the plaintiff made an allegation that some principals had denied him a teacher contract or a teacher contract. And her argument was, well, that the principals generally were aware I complained and the court said that requires speculation. If there was something further that she'd reviewed her as full personnel file and it contains his person and it contained those complaints or that supervisors are generally briefed, that was for an inference. But this is pure speculation. But if you take it a step further, Lieutenant Finley, Lieutenant Finley, there's no evidence in the supervisor. And there's no evidence he knew of any protected of any internal complaints or any EOC charges. You know, he testified at trial. He learned about it. Excuse me. This strikes me as rather odd. I mean, if you're working in a police department, these things are just well known. It just doesn't take me very much at all to think that is entirely possible that Finley would have known this. I don't have to conclude that he did. But it seems to me that the jury could permissibly have decided so. Well, Your Honor, I think there has to be some sort of evidence or be too speculative. There are other cases when Ninth Circuit has said that you can't just speculate without knowledge. And this is a police department with, I believe, over 2000 sworn officers, people working graveyards, swing shifts, different shifts, people coming from absolutely different parts geographically. Somebody could be coming from the Southeast Valley in patrol and go to a robbery unit that's downtown. They would not necessarily have knowledge of this. And it's not something that's publicized. Obviously, a sensitive personnel complaint is not disseminated on a department-wide bulletin. When you say a sensitive complaint, Faulkner publicly tells people within the unit that this is so. It's not as though this was a secret. Faulkner himself alerted everybody. So to say that Finley wouldn't have known this because it was a secret, well, no, it was not a secret. Well, the allegation, as he said, we have somebody joining us because of a settlement. A settlement could mean any type of thing. It could be a worker's compensation. Everybody knows the code on that. I mean, Your Honor, I feel that just it's not enough to assume knowledge based on that. But apart from knowledge, you also have to show but for causation. And it's lacking here as to why there would be any retaliatory motive for any of the actors. So you have a lieutenant, let's say, plaintiff's supervisor, about three years, I believe, after the initial protected activity, about a year after the plaintiff helped Candace Wilson, and he's presumed to have a retaliatory motive because even if he had the knowledge, knowledge... Just a little bit of the time sequence. Okay. Green is reprimanded, takes stress leave. He returns from stress leave on April 2, 2012. On April the 24th, so basically three weeks later, he helps Wilson file the complaint. And then on May the 2nd, so basically a week later, he's required to go undergo a work fitness evaluation, which he's never had before. This is a pretty rapid sequence of events, don't you think? Well, he had taken stress leave for four to six weeks in February. So he did have a history of having some issues. But again... But let me repeat those dates for you. He returns from stress leave on April the 2nd. On April the 24th, he helps Wilson file the complaint. On May the 2nd, he's forced to undergo the workman's fitness evaluation. So all that happens within a month. Okay. So if we're talking about within a month, but then that presumes that the decision maker knew that he assisted Candace Wilson. Now you talked about that Commander Faulkner said there was a settlement. That referred to something that happened two years earlier. I think two years is far too long of a time frame to draw any type of causal nexus conclusion that something happened too early. I think this court has said that would be outside the bounds. I think this court has even said four months is too far to assume. In an Oregon case, there's an Italian saying that revenge is the best enjoyed cold. I understand that it was very quick. There's a strong inference, but I don't know that it's absolutely outside if it's a long period. But here, what I'm talking about is a very short period. It's a month. But that assumes that a decision maker who's had no retaliatory bias gave him the order. Apart from that, that's the information that's in the record. What did the record show was the reason the city put in for asking for the fitness examination? The record doesn't have any specific testimony on that issue other than, you know, we do know historically that he had taken stress lead. We know he, they believed he overreacted to a supervisor, giving him expectations, but it would be plaintiff's burden to show, but for cause, not the city's burden to disprove retaliation. Well, I thought there was some behavior on the job that preceded the request, because if there was nothing, then I don't see how. There was an issue where he, on the job. Yes, Your Honor, sorry. There was an issue where, for instance, he was found to have been independent investigation of negligently supervised his detectives in completing and obtaining a warrant. It was served at the wrong location. Somebody, a home, an innocent person's dog was killed during the execution of the raid. There's testimony that's, I think, uncontradicted that he was not turning in his supervisory notes and case management notes. He had taken the stress leave after the warrant incident where the dog was killed. He had seemingly overreacted, or at least in the view of the city, to an innocuous meeting where somebody was given a list of job expectations. It was a brand new job for him. He didn't have to compete for it. He was put in without testing for it, and so his supervisor went over job expectations, and he reacted very poorly and very angrily to that situation. So there are a number of facts. People were opposing him, but Nassina not only gives him this, according to his evidence, not only gives him this very long list of unrealistically detailed expectations, but has an uncharacteristically long meeting, I think, lasting over two days for maybe six hours. That's his testimony. That is testimony, but I think in a vacuum that doesn't prove anything because we don't have any comparators as to how Lieutenant Nassina orients and onboards other people. That evidence, if it existed, that he was treated differently. The evidence from Mr. Green is that that was extraordinarily unusual. For him, but he'd never worked for Lieutenant Nassina. To find out whether or not she was treating him poorly, we have to know whether she's treating him differently than others, and that evidence would be easily attainable if it exists. They could have deposed the other sergeants, or Sergeant Green could have spoken to them informally and said, tell me about your onboard meeting with Nassina. Did it last six hours? Did she give you expectations? We know the expectations document has a revision date on it, so it existed before Sergeant Green. It's not something that was just created for him, and so without knowing how she treats others, we can't say that she treated him poorly. He might have perceived it to be different than what he experienced in his patrol jobs, but he'd never been a robbery detective before, so he doesn't know how Lieutenant Nassina onboards people. But again, back to just the fitness for duty is nobody's established who, haven't established who ordered it. We don't know who ordered it, and how do we know whether or not that person knew that he assisted Candace Wilson a month earlier? So you have to make an inventive fact about who ordered it. Invent the fact about that person possibly knowing about the Candace Wilson complaint. That's very different than, that's not what Faulkner talked about. Candace Wilson complaint, there's no evidence that was published. There's a very good argument in the jury that the evidence could have been interpreted in a different way. Yes, Your Honor, and Judge Medawa also heard all this and found that the evidence wouldn't support it because of these missing ingredients, because the but-for causation of the Nassar case means it's heightened standard. It has to mean something, and the court talked about as a matter of public policy, they want to screen out unsupported retaliation claims, because retaliation can be used as a sword by people who want to avoid discipline, and so they need to be screened under this heightened standard. For the heightened standard to mean something, it means that the plaintiff can't ask the court or jury to invent facts that have no support. Reasonable inferences are one thing, but inventing the identity of a decision maker, inventing knowledge, inventing motive, goes far beyond what a jury or a court should be permitted to do. So you're suggesting that the timing and the common knowledge that there all of that would support perhaps a finding that his activity was a motivating factor, but not that it was a but-for cause. Is that what you're suggesting? So if what we have is two years earlier he engaged in protected activities, somebody's knowledge, I don't believe that those two things in combination without more establish a retaliatory animus that was the but-for cause of the challenged action. Was his assistance to Ms. Wilson a protected act as to which he would be protected against retaliation? Your Honor, we don't believe so, because his testimony we cite in his brief was that he was required to do so. So there's a little bit of an unusual process at the Phoenix PD in that a supervisor is the one that was required to take down the complaint, so somebody doesn't go directly to human resources or the equal process. If I have a complaint, I go to my supervisor and say, I'd like to make a complaint, and the supervisor says, okay, let me get the form. Let me fill it out for you. Let me pass it along the chain of command. So that's different than opposing or actively taking a stand against the employer. That's just an employee serving as a bureaucrat and taking down information, which is required. We believe that Sargent testified. I did what I had to do under the policy. I did what I was required to do. Okay. Mr. Montoya, we took you over time. Why don't we put three minutes on the clock for rebuttal? Thank you, Your Honor. A couple of things. The announcement that Faulkner gave was to the entire robbery unit. That's the record at page 1237. Question to Al Richard, who was a member of the robbery unit. So Commander Faulkner told the robbery unit that Jeff Green would be coming on There was a meeting that was held by the Violent Crimes Bureau Commander David Faulkner. The whole unit was told. Second of all, Messina did know of protected activity. Jeff Green gave a copy of Candace Williams' sexual harassment complaint to Lieutenant Messina, his direct supervisor, who was not happy about it. In turn, Messina gave it to Faulkner. Messina and Faulkner were aware of the protected activity. Commander Faulkner testified that he never even worked with Green. He was in charge of the entire Violent Crimes Bureau. The robbery unit is a component of that so he was a top-level supervisor. He wasn't a day-to-day supervisor. That's even more true of Commander Pena. He never even worked with Sergeant Green. How would he know anything about his behavior? No one ever told Sergeant Green why he was being subjected to the first fitness for duty examination and my colleague's recitation of a bunch of reasons. No one testified to that trial. That is purely the argument of counsel. However, as to the second fitness for duty examination that followed Sergeant Green's refusal to obey Finley's order to get rid of Candace, record page 1417, the doctor who conducted the fitness for duty examination, Dr. Lett, says, quote, Sergeant Green was referred for a work fitness re-evaluation by his employer, the Phoenix Police Department, City of Phoenix, at the request of his supervisor, Lieutenant Troy Finley, page 1417. Second of all, the question whether it's a motivating factor or a but-for event, that's a question of fact. And that's a very subtle question of fact. As Judge Fletcher has pointed out, most people don't admit, hey, I'm retaliating against you because you complained. And this court has repeatedly held that. Robinson v. York, 556, fed third at 825. That's a 2009 decision. And Wagle v. Murray, 560, fed second at page 401. There's a lot of evidence of retaliation in this case. That's what the EOC also concluded. That's what the jury quickly concluded. And that's what the judge vacated, only based upon the testimony of the city's witnesses, which in the context of Rule 50, the district court was obliged to ignore. Yes, but it was for the judge to decide whether a rational jury could find that this was the but-for cause. Isn't that correct? Yes, true, your honor. But in making that decision, the district court had to exclude the testimony of interested witnesses, that the jury was not obliged to believe. And the only witnesses who testified that there were legitimate reasons were Finley, Faulkner, and Collins, the very supervisors that Green was accusing of retaliation of illegal conduct in the first place. I see my time has expired. Okay, any further questions from the bench? Okay, thank both sides for your arguments. Green v. City of Phoenix, submitted for decision. Thank you. Thank you.
judges: Schroeder, W. Fletcher, Hunsaker